UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF VIRGINIA
Richmond Division

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| CALDWELL/VSR, INC., | ) | Case No. **04-41560-DOT** |
| | ) | |
| Debtor. | ) | |

## ORDER AND OPINION DENYING RULE 60(b) MOTION

On May 26, 2005, Weslaco Holding Company, LLC filed a motion to amend this court's March 8, 2005, order authorizing the sale of substantially all of debtor's assets free and clear of liens. Weslaco made its motion pursuant to Rule 60(b) of the Federal Rules of Civil Procedure, made applicable to bankruptcy proceedings by Rule 9024 of the Federal Rules of Bankruptcy Procedure. On May 31, 2005, Frost National Bank joined in the motion. The official committee of unsecured creditors filed a response to the 60(b) motion on June 3, 2005, and on that same day Hunter Douglas Wood Products also filed an objection. On June 4, 2005, debtor Caldwell/VSR, Inc. filed its response to the motion.

On June 7, 2005, the court held a hearing on the 60(b) motion and heard argument from counsel for Weslaco, Frost and debtor in support of the motion. Counsel for the creditors' committee indicated at the hearing that the committee's concerns had been resolved through an accommodation with Weslaco. Consequently, only Hunter Douglas opposed the motion at the hearing. On June 10, 2005, Hunter Douglas filed a post-hearing statement in further opposition to the motion, and on June 14, 2005, Frost submitted a letter and affidavit in further support of the motion.

After hearing the arguments of counsel, considering the motion and the responses and objections to it, and also considering the evidence submitted in support of and in

1

opposition to the motion, including the supporting declarations and affidavits, the court has determined that the evidence presently before it does not present cause to grant the Rule 60(b) motion on the grounds of "mutual mistake." In so doing, the court makes the following findings of fact and conclusions of law.[1]

### Jurisdiction and Venue

This court has jurisdiction over this case and the motion pursuant to 28 U.S.C. §§ 157 and 1334, and this matter is a core proceeding pursuant to 28 U.S.C. §§ 157(b)(2)(A), (M) and (O). Venue of this case in this district is proper under 28 U.S.C. §§ 1408 and 1409.

### The Parties in Interest

Debtor was in the business of applying paint and stain finishes to wood blind and shutter components. Debtor manufactured its products at a leased facility in Weslaco, Texas.

Weslaco is the assignee of the claims of Waterside Capital Corporation and CapitalSouth Partners Fund I Limited Partnership ("CapSouth") against debtor. Waterside and CapSouth were secured creditors of debtor with a second priority lien against substantially all of debtor's assets. Weslaco is also the purchaser of substantially all of debtor's assets pursuant to the Order And Judgment Authorizing Sale Of Property Free And Clear Of All Liens entered by the court on March 8, 2005.

Frost National Bank is a secured creditor of debtor with a first priority lien against substantially all of debtor's assets.

---

[1] Findings of fact shall be construed as conclusions of law and conclusions of law shall be construed as findings of fact when appropriate. See, Fed. R. Bankr. P. 7052.

Hunter Douglas was the Debtor's largest customer and did business with debtor from approximately 1999 – 2005.

### The Relationship between Debtor and Hunter Douglas

Debtor originally served principally as a supplier of finished wood used to manufacture custom wood blinds. Hunter Douglas supplied the raw wood to debtor, and debtor then functioned as a finisher of that raw wood, which at all times was owned by Hunter Douglas. Debtor then returned the finished wood to Hunter Douglas. A running inventory record was maintained and verified by debtor of all raw wood sent to debtor and all finished wood received by Hunter Douglas from debtor.

In August 2004, Hunter Douglas conducted an inventory of its wood located at debtor's facility. The result of this inventory revealed that debtor was unable to account for a large quantity of raw wood owned by Hunter Douglas. Hunter Douglas also noted that it appeared a substantial amount of Hunter Douglas' wood had been processed improperly by debtor and rendered unusable for commercial purposes. On August 24, 2004, Hunter Douglas shared the results of this inventory with debtor by email. Debtor acknowledged its responsibility for the lost and spoiled wood and indicated that it would make good to Hunter Douglas for the loss.

In addition, at some point, it came to Hunter Douglas' attention that debtor needed to secure basswood raw slats sourced from North America for export to its Canadian customers. Because of Hunter Douglas' existing relationship with debtor, it agreed to sell some of its raw basswood slats to debtor at cost as an accommodation to a business partner. Hunter Douglas thus became a limited vendor to debtor.

### The Bankruptcy Proceedings

On December 15, 2004, debtor filed a voluntary petition with this court under chapter 11 of the bankruptcy code and filed its schedules and statement of financial affairs. According to Schedule F, on the petition date, debtor owed Hunter Douglas $60,493.06. Debtor has not amended Schedule F in this regard.

Debtor continued to manage its property and operate its business as a debtor-in-possession pursuant to sections 1107 and 1108 of the bankruptcy code through and including the June 7, 2005, hearing on the Rule 60(b) motion.[2]

**The Critical Vendor Motion and Order**

On December 23, 2004, the Debtor filed a motion in its bankruptcy case seeking to pay Hunter Douglas as a critical vendor.[3] The motion stated that Hunter Douglas' pre-petition claim totaled $121,778, which Debtor sought to pay in order to maintain its business relationship with Hunter Douglas. According to debtor, Hunter Douglas had made clear that it would neither sell slats to nor purchase product from debtor unless the claim was paid in full.

On January 3, 2005, Waterside objected to the critical vendor motion, and on January 5, 2005, the court held a hearing on the motion. On the morning of, and shortly before, the hearing, a meeting was held at the office of Kutak Rock LLP. During this meeting, the representative of Hunter Douglas was asked specifically whether the amounts sought to be paid by the critical vendor motion were the only amounts owed by the Debtor to Hunter Douglas. He responded that no other amounts were owed. This representation was made again at a meeting immediately following the one held at Kutak

---

[2] Debtor's case was converted to chapter 7 on June 23, 2005.
[3] Hunter Douglas' status as a supplier/vendor was based upon its sale of the raw basswood slats to debtor.

4

Rock. Present at the later meeting were representatives of CapSouth, Frost, Waterside, Hunter Douglas, the creditors' committee, and debtor.

At the critical vendor hearing, debtor's counsel informed the court that the pre-petition amount owed to Hunter Douglas was $121,778, and that Hunter Douglas would not continue to do business with debtor until that amount was paid. Hunter Douglas represented on the record at the critical vendor hearing that it agreed "with everything that's been stated" in support of the critical vendor motion. The court granted the motion and requested that an order be prepared.

On February 25, 2005, the court entered an order on debtor's motion for authority to pay Hunter Douglas as a critical vendor. The critical vendor order provided that Hunter Douglas's "pre-petition claim of $121,778" would be paid by debtor. In exchange for the critical vendor payment, Hunter Douglas agreed to place six customer orders of at least one million linear feet of wood products each and to honor normal payment terms for those orders.

Pursuant to the critical vendor order, the critical vendor claim was to be paid over a period of not less than six (6) weeks. The parties do not dispute that the critical vendor claim was paid in full.

**The Sale Process**

On December 22, 2004, debtor filed a motion to authorize the sale of substantially all of its assets and seeking approval of bidding procedures to facilitate the sale. A hearing was conducted on January 20, 2005, at which the court approved the sale motion and bid procedures, and an order on the motion was subsequently entered.

5

On February 23, 2005, Weslaco submitted its bid to purchase substantially all of the assets of debtor.  In formulating its bid, Weslaco reviewed debtor's account receivable balances, inventory and equipment. In addition, Waterside's counsel specifically asked debtor's counsel whether debtor owed to Hunter Douglas any amounts other than the pre-petition $121,778 critical vendor claim.  The pre-petition claim having been paid in full, on March 2, 2005, debtor's counsel responded via e-mail to Waterside's counsel that debtor "owes no amounts to Hunter Douglas."

Debtor's counsel, Neil E. McCullagh, when asked about whether there were additional claims by Hunter Douglas against debtor, responded that after "consulting with my client," no such amounts were owed and, upon request, followed up with an e-mail which stated that "debtor owes no amounts to Hunter Douglas." Further, Waterside itself reviewed weekly collateral reports supplied by debtor to Frost. Those reports did not indicate the existence of a substantial claim held by Hunter Douglas.

On March 3, 2005, the court held a hearing to consider the sale motion, and Weslaco's bid was the only bid considered. The court granted the sale motion on March 3.  Following the sale hearing, a draft of the order approving the sale of debtor's assets to Weslaco was negotiated, which contained a clause providing for the purchase of any claims debtor had against Hunter Douglas but did not provide for assumption by Weslaco of any obligations debtor might owe to Hunter Douglas.  Counsel for the creditors' committee requested that the order approving the sale of the assets provide that if there were any obligations owed by the estate to Hunter Douglas, those claims should go with any Hunter Douglas receivables being purchased by Weslaco.

6

As a result of the request by counsel for the creditors' committee, Waterside's counsel again specifically asked McCullagh, counsel for debtor, whether there was anything else owed to Hunter Douglas by debtor or the estate, and McCullagh responded that there was nothing else out there. Relying on this representation and the other representations referred to above, Weslaco purchased any claims debtor had against Hunter Douglas and agreed that Weslaco would assume and be responsible for payment of all claims Hunter Douglas had against the estate.

On March 8, 2005, the court entered the sale order. Pursuant to the sale order, Weslaco purchased Hunter Douglas's receivable with debtor, along with other assets. Specifically, the sale order provided, in pertinent part:

> The Debtor proposes to convey all of its assets, except those assets expressly excluded herein (the "Property"), including, but not limited to, the following:
>
> I.      All claims and choses in action, including without limitation . . . (iii) claims against Hunter Douglas Wood Products, Inc. ("Hunter Douglas"), including, but not limited to, any claims or causes of action arising under the provisions of Chapter 5 of the Bankruptcy Code against Hunter Douglas (the "HD Claims") . . . . **In connection herewith, and as a condition of the conveyance to it of the HD Claims, Weslaco (as hereinafter defined) shall assume and be responsible for payment of all claims of Hunter Douglas against the estate,** together with reasonable attorneys' fees incurred by the estate, if any, in defense thereof . . . .

The sale order further "directed" debtor to execute all necessary documents to consummate the sale to Weslaco, including an appropriate bill of sale. The bill of sale transferring debtor's assets to Weslaco was signed on March 10, 2005.[4]

---

[4] Hunter Douglas alleges that the sale of assets to Weslaco closed on March 18, 2005 based on the statements of its employees. See Certification of Timothy Adams at ¶ 26 and Certification of Kevin Armstrong at ¶ 28. However, no foundation is provided for these statements and no foundation is evident (since there is no contention that Hunter Douglas was involved in the closing process), and Hunter Douglas

7

**The Hunter Douglas Claim**

On or about April 8, 2005, Hunter Douglas filed proofs of claim asserting it was owed approximately $1.3 million.[5] On April 14, 2005, Hunter Douglas filed suit against Weslaco, alleging that it was owed over $1.3 million, consisting entirely of pre-petition claims.[6] Hunter Douglas further alleged that, since Weslaco assumed all Hunter Douglas claims against the estate pursuant to the sale order, Hunter Douglas was entitled to use its $1.3 million claim as a setoff to amounts it admittedly owed to Weslaco and to collect from Weslaco the balance of its claim in excess of the setoff.

While the evidence is conflicting, it is clear to the court that during the course of the negotiations for the critical vendor financing and the eventual sale of debtor's assets to Weslaco, highly placed individuals of both Weslaco and debtor were aware that there was an unresolved dispute in the amount of at least one million dollars between debtor and Hunter Douglas regarding both the condition of the unfinished materials supplied to debtor by Hunter Douglas and the quality of some finished work for Hunter Douglas by debtor. A series of emails between debtor and Hunter Douglas documents the history of the dispute, which began as early as August 2004. The estimate of one million dollars as a damages amount was specifically raised in November 2004.

Debtor's management did not disclose these issues and did not report them to debtor's counsel. Furthermore, debtor stated that it did not intend that Weslaco have any responsibility for the Hunter Douglas claim or that the Hunter Douglas claim be assumed by Weslaco.

---

provides no foundation or evidence to support these statements. Thus, the Court finds no evidence in the record to support this Hunter Douglas allegation.

[5] Hunter Douglas filed two proofs of claim with the court, the earlier of which was filed on April 8, 2005.
[6] The lawsuit, filed in the Circuit Court of the City of Norfolk, was removed to this Court and is pending as Adversary Proceeding No. 05-03055-DOT.

8

## Conclusions of Law

The Bankruptcy court has the authority to alter or amend its own orders to remedy inequities, through, among other methods, the use of Rule 60(b). Rule 60(b), made applicable to bankruptcy proceedings by Bankruptcy Rule 9024, provides in pertinent part:

> Upon a motion and upon such terms as are just, the court may relieve a party from a final judgment, order or proceeding for the following reasons: (1) mistake, inadvertence, surprise or excusable neglect; (2) newly discovered evidence which by due diligence could not have been discovered in time to move for a new trial under Rule 59(b); (3) fraud, misrepresentation, or other misconduct by an adverse party… or (6) any other reason justifying relief from operation of the judgment. The motion shall be made within a reasonable time and for reasons (1), (2), and (3) not more than one year after judgment or order.

Fed. R. Civ. P. 60(b). The primary purpose of Rule 60(b) is "to permit the trial court to reconsider and correct obvious but substantive errors of law in a judgment . . . ." 3 James Wm. Moore et al, Moore's Manual: Federal Practice and Procedure § 26.20 (2005). Rule 60(b) "attempts to balance the interest in the stability of judgments with the interest in seeing that judgments not become the instruments of oppression and fraud." 10 Alan N. Resnick and Henry J. Sommer, Collier on Bankruptcy ¶ 9024.03 (15th ed. 2005). To achieve this balance of interests under Rule 60(b), courts may vacate an order or judgment or provide relief from and alter or amend parts of orders or judgments. See In re UAL Corp., 299 B.R. 509 (Bankr. N.D. Ill. 2003); see also In re Lintz West Side Lumber, Inc., 655 F.2d 786 (7th Cir. 1981). Rule 60(b)(1) provides for relief from a judgment or order caused by "[m]istake, inadvertence, surprise or excusable neglect." Fed. R. Civ. P. 60(b)(1). This section is applicable to correct substantive mistakes in the

9

rights of the parties. Rule 60(b)(1) is the appropriate vehicle for amending an order to correct any inequities resulting from reliance on mistaken facts. See In re Harbor Fin. Group, Inc., 303 B.R. 124, 133-134 (Bankr. N.D. Tex. 2003) (citing 11 Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure: Civil 2d § 2858 (2d ed. 1995) ("Under Rule 60(b), 'consent judgments [similar to the purchase agreement as part of the Sale Order in this case] have been reopened when they were agreed to because of erroneous factual representations.")). Only the existence of a mutual mistake can justify relief under Rule 60(b)(1). As the court in In re Harbor Financial Group remarked:

> "Generally speaking, a party who takes deliberate action with negative consequences…will not be relieved of the consequences [by Rule 60(b)(1)] when it subsequently develops that the choice was unfortunate." Cashner v. Freedom Stores, Inc., 98 F.2d 572, 577 (10th Cir. 1996), (quoting 7 Moore, Federal Practice ¶ 60-22[2], p. 60-182.)…Furthermore, one party's mistake as to the facts of a settlement agreement does not justify relief from the settlement agreement. "Existing precedent…dictates that only the existence of fraud or mutual mistake can justify reopening an otherwise valid settlement agreement." Brown v. County of Genesee, 872 F.2d 169, 174 (6th Cir. 1989).

Id.

After reviewing the entire record here, including the pleadings, the supporting evidence and all of the declarations and affidavits, the court believes that relief under Rule 60(b)(1) is not appropriate on the grounds of mutual mistake because Weslaco knew that debtor owed additional amounts to Hunter Douglas when the sale motion was granted and the sale order finalized. There is an abundance of email correspondence between Hunter Douglas and various principals of the debtor, beginning as early as August 2004. Therefore, since it appears the debtor was aware of the claim, I cannot

10

make a finding that the contract between the debtor and Weslaco was entered into by <u>mutual</u> mistake.

Weslaco points out that representative of Hunter Douglas' made statements in the meeting on January 5, 2005 to the effect that the Hunter Douglas claim did not exist. Kevin Armstrong, Hunter Douglas' representative, has stated that this was not his intent, and that he meant only to represent that there were no additional claims for Hunter Douglas' supplying debtor with basswood in Hunter Douglas' limited capacity as vendor to debtor. "It seemed plain to me that Mr. Armstrong was saying that Hunter Douglas had no other claims and was being fully satisfied through the agreement to repay the $121,778.18 that was being negotiated at the Meeting." McCullagh Affidavit at ¶ 17. Nothing in the record indicates that Mr. Armstrong's statements did not convey this meaning.

Weslaco also argues that throughout the sale process, McCullagh was debtor's representative and its contact for information and Weslaco utilized him accordingly. It is undisputed that he lacked knowledge of the Hunter Douglas claim at the time of the sale hearing and entry of the sale order and believed there was no Hunter Douglas claim. Thus, the belief of McCullough, Weslaco's attorney, that the Hunter Douglas claim did not exist was justified. Arising from the same set of circumstances and coupled with the weekly collateral reports submitted to it by debtor (showing no Hunter Douglas claim), the belief of debtor's first priority lien creditor Frost that the Hunter Douglas claim did not exist was also justified. However, it is clear from the record that crucial officers and employees of debtor were aware of the claim for lost and spoiled wood.

11

The evidence presented to the court depicts a situation in which the representatives of debtor who were negotiating the critical vendor agreement and the sale of debtor's assets were either unaware of the claim of Hunter Douglas for lost and spoiled wood, or they were unaware of the significance of that claim. In fact, in pleadings submitted to the court, debtor stated:

"The Debtor denies that it made any intentional misrepresentations or engaged in any fraud or deliberate actions. The Debtor acknowledges that there were issues to be dealt with between the Debtor and Hunter Douglas, but the Debtor's management did not believe those issues needed to be disclosed in its bankruptcy case and, therefore, did not report them to the Debtor's counsel. The Debtor's management saw on-going "issues" as an inherent part of the Debtor's business relationship with Hunter Douglas."

In light of the above, debtor cannot claim to have been acting under a mistaken belief when the sale order was entered, and therefore relief under Rule 60(b) because of "mutual mistake" is not proper.

In addition, Weslaco claims that the assertion of the Hunter Douglas claim after the entry of the sale order constitutes "newly discovered evidence" under Rule 60(b)(2). However, the record is not well developed with respect to the due diligence on the part of Weslaco in its assumption of the obligations of the debtor to Hunter Douglas. Without further evidence, the court cannot make a finding as to whether Weslaco should have discovered the Hunter Douglas claim prior to the execution of the sale contract.

Weslaco also claims that if the debtor had knowledge of the Hunter Douglas claim and did not disclose it until after the execution of the contract, its conduct

constituted fraud, misrepresentation or misconduct. The record is insufficient for the court to make a factual finding of fraud.

Accordingly, the motion to alter or amend must be denied. However, this denial will be without prejudice to the rights of the movant to renew the motion and for the parties to present additional evidence in support of or opposition to the motion. Therefore,

IT IS ORDERED that Weslaco's motion to alter or amend this court's March 8, 2005, order authorizing the sale of substantially all of debtor's assets free and clear of liens is DENIED without prejudice to the right of Weslaco to file and new motion and for the parties to present additional evidence in support of or opposition to the motion.

Signed:_____

   /s/ Douglas O. Tice Jr.
DOUGLAS O. TICE, JR.
CHIEF JUDGE
UNITED STATES BANKRUPTCY COURT

PARTIES TO RECEIVE COPIES

Neil E. McCullagh, Esquire
Cantor Arkema, P.C.
P.O. Box 561
Richmond, Virginia 23218-0561

Lynn L. Tavenner, Esquire
Tavenner & Beran, PLC
1015 East Main Street, First Floor
Richmond, Virginia 23219

Michael A. Condyles, Esquire
Kutak Rock, LLP
Bank of America Center

1111 East Main Street, Suite 800
Richmond, Virginia 23219-3500

Frank J. Santoro, Esquire
Marcus Santoro & Kozak, PC
1435 Crossways Blvd., Suite 300
Chesapeake, Virginia 23320-2896

Joseph M. Cerra, Esquire
FORMAN HOLT & ELIADES LLC
218 Route 17 North
Rochelle Park, New Jersey 07662

Peter S. Partee, Esquire
Michael G. Wilson, Esquire
HUNTON & WILLIAMS LLP
Riverfront Plaza, East Tower
951 East Byrd Street
Richmond, Virginia 23219-4074

Scott Vaughn, Esquire
Helms Mullis & Wicker, PLLC
P. O. Box 31247
Charlotte, North Carolina 28202

Michael D. Mueller, Esquire
Jennifer McLemore, Esquire
Christian & Barton, LLP
909 East Main Street, Suite 1200
Richmond, Virginia 23219

Robert H. Chappell III, Esquire
Spotts Fain
411 East Franklin Street, Suite 601
Richmond, Virginia 23219

Leo D. Plotkin, Esquire
Levy, Small & Lallas, P.C.
815 Moraga Drive
Los Angeles, California 90049-1633

Lee Barnhill, Esquire
Assistant United States Trustee
Office of the United State Trustee
600 E. Main Street, Suite 301
Richmond, Virginia 23219